# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

SUSAN WITZKA for RYAN
WITZKA,

      Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social
Security,

      Defendant.

No. C05-4033-DEO

ORDER

---

## INTRODUCTION

In this action, plaintiff Ryan Witzka, by his mother Susan Witzka, seeks judicial review of an administrative decision on his application for supplemental security income (SSI) benefits. This Court has seen this case once before, as case number 01-CV-4126. At that time, this Court concluded that the Commissioner's decision should be reversed and the matter was remanded to the Commissioner for further development of the record in October 2002, with directions for the Administrative Law Judge ("ALJ") to consider Ryan Witzka's diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD").

# I. PROCEDURAL BACKGROUND

Plaintiff Susan Witzka applied on behalf of her son, Ryan Witzka, for social security income (SSI) benefits on March 29, 1991. Plaintiff was awarded benefits by a decision dated June 27, 1991, with an onset date of March 1, 1991[1]. Pursuant to a continuing disability review, the Social Security Administration (SSA) determined that, due to improvement in his medical condition, plaintiff was no longer entitled to benefits as of October 15, 1998 (Tr. 102). On December 21, 1999, a hearing was held before an Administrative Law Judge (ALJ). On April 28, 2000, the ALJ issued a final decision which found that plaintiff was no longer under a disability after applying the interim final disability rules (Tr. 13-17). This decision became the final decision of the Commissioner after the Appeals Council denied plaintiff's request for review on November 16, 2001 (Tr. 4-5). The ALJ's decision was reviewed by this Court, then remanded in October 18, 2002. On

---

[1]Ryan Witzka was found disabled since birth due to asthma and low levels of immunoglobulins. Immunoglobulin is any of the structurally related glycoproteins that function as antibodies. A deficiency basically means the body is low on immunoglobulins and cannot fight off infections very well. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 912 (30th ed. 2003). Glycoprotein is a conjugated protein containing one or more covalently linked carbohydrate residues. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 787 (30th ed. 2003).

June 12, 2003, and July 30, 2003, the hearing on the remand and on the new application that had been filed in September 2001 (while the earlier case was proceeding through our Court) was held[2]. On November 24, 2003, the ALJ denied benefits under the remand and the new application, this time applying the final rules[3]. The Appeals Council declined to review the case on February 25, 2005. The November 24, 2003, decision of the ALJ, therefore, stands as the final decision of the Commissioner.

## II. CHILDREN'S DISABILITY OVERVIEW

Legislation was signed into law on August 22, 1996, which altered the statutory standard for children seeking SSI benefits. The new definition of childhood SSI disability provides that:

> An individual under the age of eighteen (18) shall be considered disabled for purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death, or which have lasted, or can be expected to

---

[2]There were technical difficulties during the first hearing, so it had to be continued; it was completed in July.

[3]The final rules became effective January 2, 2001. As the second application was filed in September 2001, and the remand was also issued after that date, the final rules apply to this case.

last for a continuous period of not less
than 12 months.

Welfare Reform Act at § 211(a)(4) (codified at 42 U.S.C. §
1382c(a)(3)(C)(I)).

There is a 3 step process for determining whether a child
is eligible for SSI benefits. See 20 C.F.R. § 416.924(a)
(2005). First, the ALJ must determine if the child is engaged
in substantial gainful activity. If not, step two requires
the ALJ to determine whether the child's impairment or
combination of impairments is severe. If it is determined
that the limitation is "severe," the analysis moves to step
three. At step three, the ALJ must determine whether the
child's impairment(s) meet, medically equal, or functionally
equal, the severity of a listed impairment set forth in
Appendix 1 of 20 C.F.R. Part 404, Subpart P, 20 C.F.R. §
416.926a (2005). If the child's impairment does not meet or
equal a listed impairment, the ALJ will assess all functional
limitations caused by the impairment(s) to determine whether
the functional limitations are disabling. In order for an
impairment or combination of impairments to functionally equal
a listing, the impairment or impairments must either result in
a "marked" limitation in two domains of functioning, or an

"extreme" limitation in one domain of functioning[4].  20 C.F.R. § 416.926a(a).

A limitation is considered marked if the medical evidence shows that the impairment seriously interferes with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(I).  If the medical evidence shows the impairment very seriously interferes with the child's ability to independently initiate, sustain, or complete activities, it is considered extreme.  20 C.F.R. § 416.926a(e)(3)(I).

A "'marked' limitation is generally demonstrated by valid scores, that are at least two but less than three standardized deviations below the mean, on a comprehensive standardized test designed to measure ability or functioning in that domain.  The results must also be consistent with the child's day-to-day ability or functioning in that domain."  Tr. 389.  An extreme limitation is the level of functioning equivalent to scores on a standardized test that is at least three standards below the mean.  An extreme limitation may cause

---

[4]The domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being. 20 C.F.R. § 416.926a(g-l) (2005).

very serious limitation in day-to-day functioning in only one activity or when the interactive or cumulative effects of the impairments limit several activities. Tr. 389.

The first domain is acquiring and using information, which is how well the child acquires or learns information, and how [he] uses the information he has learned. 20 C.F.R. § 416.926a(g). The next domain is attending and completing tasks, which is the extent to which the child is able to focus, maintain attention and initiate and complete activities. This domain also includes an assessment of the pace at which activities are performed and the ease with which the child changes activities. The third domain is interacting and relating with others, which includes an assessment of how well the child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates, complies with rules, responds to criticism, and respects and cares for others' possessions. The fourth domain is moving about and manipulating objects, which includes the child's ability to move his body from one place to another. The fifth domain is caring for yourself, which evaluates how well the child maintains a healthy emotional and physical state including appropriate meeting of his emotional and

physical needs.  Finally, the sixth domain is health and physical well-being, which assesses the cumulative effects on the child of his physical and mental impairments and the related treatment or therapies.

Additionally, the child's functional level is assessed based also on his age range; in this case, Ryan's age was assessed in the two ranges of school age children (age 6 to 12) and adolescent children (age 12 to 18)[5].

### III. ALJ'S DECISION

The question before the ALJ was whether Ryan continues to be disabled under section 1614(a)(3)© of the Social Security Act.  The ALJ stated that as to the first domain, Ryan was less than markedly limited.  Although he was in special education classes, he did learn to read, write, and do arithmetic; albeit at a level below that of his grade peers. The ALJ based this finding on the report of a psychologist who, in April 2002, reviewed Ryan's medical records and school reports.  The ALJ also considered that in May 2002, Ryan's teacher indicated he had a slight to obvious problem in half of the ten areas regarding acquiring and using information.

The ALJ then addressed the next domain, of ability to

---

[5]This is because Ryan was 7 when his disability was deemed to be improved, and he was 13 at the time of the hearing.

focus, maintain attention, and initiate and complete activities. While Ryan was in the 5th grade, only one of Ryan's teachers said he had a serious problem in two of thirteen areas. By March 2002, it was noted that he had "no, to a slight," problem in attending and completing tasks in the thirteen areas. The ALJ noted that medication "has been effective in enabling the child to focus." Tr. 390. The ALJ also considered that at the hearing, Ryan's dad testified that he had to keep Ryan focused on starting and completing his homework. The ALJ found Ryan less than markedly impaired in this domain.

The third domain involves interaction with others. The ALJ noted that "the child's parents [usually his mother] have repeatedly advised treating physicians that Ryan is doing well." Tr. 391. In November 2000, he was "identified as working well with peers and adults;" in November 2001, Dr. Baker opined that he did not seem to have significant difficulty functioning in an age-appropriate manner; and in November 2002, a school report noted that he was pleasant and respectful. At the hearing in June 2003, Ryan's dad said he frequently got into arguments with his older brother. The ALJ decided that this alone did not make him markedly limited in

his ability to interact and relate with others.

In the fourth domain, ability to move a body, there has been no report that Ryan has difficulty in this area. Accordingly, the ALJ found he has no functional limitation in this domain.

In the fifth domain, the ALJ must evaluate Ryan's ability to care for his well being- his emotional and physical state- his ability to cope with stress, environmental changes, and to care for his own health, possessions and living area must be addressed. Ryan's fifth grade social studies and science teacher reported that he had an obvious problem in two of twelve areas, a slight problem in one area, and no problem in eight areas. School reports also note that Ryan takes his medication as prescribed and uses his inhaler when needed. Ryan's dad testified that he must remind Ryan to bathe and wear a clean change of clothes. The ALJ determined that Ryan has no limitation in this domain.

In the final domain, the ALJ considers the cumulative effects of any physical and mental impairment. Here, the ALJ decided that Ryan no longer has effects of his early problems of immunoglobulin deficiency. Tr. 391. He uses an inhaler effectively, and it has been continuously reported that he

does well on Adderall and Clonidine[6] for his ADHD.  Tr. 391.

His asthma is generally maintained and he uses Proventil

before athletic events[7].  He was found less than markedly

limited in this domain.  Tr. 391.

Accordingly, the ALJ found that:

1.    Ryan has never engaged in substantial gainful activity.

2.    Ryan has the following severe impairments: attention
      deficit hyperactivity disorder (ADHD), learning
      disability, low average intelligence, a history of
      asthma, a distant history of IGA immunoglobulin
      deficiency, and esotropia[8].

3.    That Ryan has sustained medical improvement of the IGA
      immunoglobulin deficiency, so he no longer meets the
      listing under that disability.

4.    That none of his impairments meet or equal a listing
      level impairment.

5.    Ryan's impairments do not functionally equal any
      impairment listed in the Appendix.


6.    Ryan does not have a medically determinable physical or
      mental impairment (or combination of) which results in

---

[6]These are medications for ADHD.

[7]Ryan's father testified that Ryan participated in the
Special Olympics in 2003.  Tr. 665.

[8]Estropia is strabismus in which there is manifest
deviation of the visual axis of an eye toward that of the
other eye, resulting in diplopia.  Called also "cross-eye".
Strabismus means "deviation of the eye the patient cannot
overcome."  6 DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 644, 1766
(30th ed. 2003).

marked and severe functional limitations.

7.  Ryan has not been under a "disability" since August 1998.

## IV.  MEDICAL EVIDENCE

The following chronology summarizes plaintiff's medical history:

| September 9, 1990 | Ryan is born |
|---|---|
| March 29, 1991 | Application for benefits |
| June 27, 1991 | Ryan awarded benefits due to asthma.  Tr. 15 |
| August 22, 1996 | New Law Enacted |
| December 20, 1996 | Ryan undergoes a full individual evaluation report – it's determined Ryan has a learning disability. Tr. 281-286. |
| May 5, 1998 | Dr. Sturdevant states Ryan has history of immune deficiency as a child. As of March 1998 his immunoglobulins were w/in normal range – Dr. states Ryan's immune deficiency was a transient problem associated w/childhood.  His asthma has responded well to treatment and shouldn't affect his cognitive or communicative development. Respiratory insufficiency could cause minor problems with motor activity but usually does not cause major difficulties.  Tr. 252 |
| August 27, 1998 | Parents notified – No more benefits |
| October 15, 1998 | Ryan no longer entitled to SSI benefits |

| | |
|---|---|
| October 16, 1998 | Ryan was seen at Prairie Pediatrics for wheezing and cough – he was not in respiratory distress – lungs showed evidence of some wheezing but he had good air entry.  Tr. 250 |
| November 17, 1998 | Dr. Baker performs psychological evaluation – intellectually Ryan is functioning at the lower end of the average range.  Ryan's main problem was working efficiently under time pressure.  Tr. 244-245. |
| December 10, 1998 | Dr. Sturdevant writes letter to disability determination services – notes that <u>Ryan has improved</u> with medications and now has intermittent episodic asthma. Tr. 248.  He would have difficulty tolerating dust fumes and cold or hot weather but is unlimited in other areas as long as he can take breaks. |
| May 28, 1999 | Ryan has lots of problems.  Tr. 345, 347. |
| February 9, 1999 | Ryan is seen at clinic for a cough – doctor notes he's out of his medication and his inhaler was unavailable to him at school. Tr. 246. |
| November 1999 | Ryan is seen by Dr. Gillette at Midlands Mental Health Department after school recommended he be evaluated due to concern that he might have attention deficit hyperactivity disorder (ADHD) – Dr. Gillette confirmed that Ryan has ADHD with a borderline IQ – his true problem is a learning disability and NOT retardation. Tr. 348-351. |

| | |
|---|---|
| December 1, 1999 | Administrative hearing before ALJ – see Transcript of hearing. |
| December 21, 1999 | Test results from Western Hills Area Education Agency show that Ryan is in 4th grade but is achieving 2nd grade work.  Tr. 358-364. |
| December 1, 2001 | Dr. Baker reports that Ryan is functioning intellectually in the low average range with a verbal IQ of 83, a performance IQ of 87, and full scale IQ of 84.  Tr. 571-2. |
| January 2002 | Dr. Muller, DO and psychiatrist sees Ryan.  Ryan's parents report that he is doing very well on Adderall and Clonidine. Tr. 629 |
| March 6, 2002 | Dr. Sturdevant reports that Ryan has ADHD and asthma. Tr. 575. |
| May, August, and November 2002 | Ryan's parents reported he was doing well at home and in school/ |
| November 13, 2002-May 29, 2003 | Midland Clinic's mental health department office notes show that Dr. Mueller and Dr. Gillette substantiate the ADHD diagnosis. Tr. 346, 636, and 644. |
| February 2003 | Ryan goes to the emergency room for strep pharyngitis and acute asthma exacerbation.  He received medication.    Tr. 640 |
| May 2003 | Dr. Muller notes that Ryan is doing well on his medication and that his parents said he did well in school that year.  Tr. 644 |

## V. ARGUMENTS

The plaintiff argues that the ALJ's opinion does not rest on substantial evidence. Plaintiff argues that the ALJ erred in failing to find that Ryan has marked limitations in the cognitive/communicative functioning domain; and the concentration, persistence and pace domain[9].

In support of this argument, plaintiff argues that testing throughout Ryan's school years indicates he has a learning disability, as he consistently tests well below grade level and his performance is less than half his grade level throughout the Woodcock-Johnson testing. He is in all special education courses by necessity. He has consistently been in the lower 10% of his class, and in the fourth grade (at the time of the hearing he was in the 8th grade) his teacher described him as "being lost" most of the time.

Ryan also argues that the ALJ ignores all of his doctors in the record, who give information about his ADHD. Ryan says that instead, the ALJ relies on the non-examining physician,

---

[9]At the hearing, Witzka's attorney acknowledged that his brief referenced the domains under the interim rules (which no longer apply), and stated that he thought under the final rules the ALJ erred, in not finding Ryan markedly limited in the first two domains, 1) acquiring and using information, and 2) attending and completing tasks, which is the extent to which the child is able to focus, maintain attention and initiate and complete activities. 20 C.F.R. § 416.926a.

Dr. John Tedesco, for interpretation of the extent of Ryan's ADHD and learning disability. Ryan states it was error for the ALJ not to give great weight to his treating physicians.

Ryan also argues it was error for the ALJ to ignore the testimony of his parents with regard to his problems with concentration, instead only stating that their testimony was inconsistent with school records. The ALJ does not cite to specific examples of contradiction.

The Commissioner argues that the ALJ properly determined that Ryan was not disabled based on the record as a whole. As to the determination to cancel his benefits in 1998, the record supports that the medical conditions that he was found disabled under at that time, his asthma and immunoglobulin deficiency, had medically improved[10]. Also, Ryan does not dispute the ALJ's findings on the other four of six domains. So it boils down to what the proper ruling should have been on the two domains: 1) acquiring and using information, and 2) attending and completing tasks.

The Commissioner argues that the ALJ thoroughly discussed

---

[10]Ryan does not object to this, that his immunoglobulin deficiency has improved and his asthma is controlled by his medication.

the doctor's reports, the parents testimony, and Ryan's school records in the decision. The Commissioner then repeats what the ALJ said in the decision (see pages 7-11 above). All of Ryan's doctors agree that his ADHD is well controlled by his medication[11]. The Commissioner also says the ALJ did support the decision, that the parents' testimony was inconsistent with the record. They say the ALJ pointed to all the places in the record where Ryan's parents told his various doctors that he was doing well. (See Tr. pp 386-8, 630, 634-8).

What the Commissioner omits, is the fact that the majority of the doctor visits were with Ryan and his mother, a woman who receives social security disability benefits for her *mental retardation*. Tr. 676. However, it is clear from the father's testimony, that it is he who has to assist Ryan with his homework, has to keep Ryan on task to start and work through his homework, has to make Ryan bathe and change his clothes, and has to remind him "three or four times to do anything." Tr. 661, 654, 663, 653.

The ALJ specifically asked about Ryan's learning disability and the "nature of that disability." Ryan's father

---

[11]Presumably this is because Ryan's mother always said he was "alright."

testified that he has "trouble functioning in certain subjects, especially math, reading . . a problem communicating with other individuals in class situations. . .and when he comes home I have to help him with his homework." Tr. 651. This testimony is supported by Ryan's low test scores and the fact that he is in special education classes in each and every one of his courses. The ALJ goes on to ask, "Because of the ADHD, I assume he has problems with concentration and staying on task?" Ryan's father answered "Yes." Then the ALJ said, "But even if he stays on task, he has problems because of the learning disability understanding materials, is that correct?" The father agreed. Tr. 662. The ALJ also discussed the fact that when Ryan was in the sixth grade, on the Woodcock Johnson tests he scored anywhere from two or three and a half years behind. <u>Id.</u> Later at the hearing the ALJ asked if Ryan has a problem remembering things, to which the father responded that he does, that his mind wanders off. Tr. 668

Additionally, Ryan's father testified that from the time Ryan awakes to the time he goes to school, he has to "be on him" to get ready. He has to remind Ryan to get dressed, change his clothes, put clean socks on, and get his homework ready. Tr. 675.

As mentioned above, the first domain is acquiring and using information, which is how well the child acquires or learns information, and how [he] uses the information he has learned. 20 C.F.R. § 416.926a(g). The next domain is attending and completing tasks, which is the extent to which the child is able to focus, maintain attention and initiate and complete activities. This domain also includes an assessment of the pace at which activities are performed and the ease with which the child changes activities.

A review of the record shows that the ALJ was in error when concluding that Ryan was not markedly limited in the domains of acquiring and using information, and attending and completing tasks. The ALJ relied almost wholly on the reports of the mother, and sometimes the mother and father, made to Ryan's medical doctors that he was doing fine. These one word/one line answers given to a doctor who presumably asked, "How is Ryan doing?" in reference to his ADHD and asthma medications, are not substantial support for a finding that Ryan is not disabled by his learning disability.

The Court will now go through and highlight some of the information found in the record that was not contradicted by anything else in the record.

In third grade, he was in special ed only in math and written language. He was working on recognizing words from a 1st-3rd grade list. His teacher said he recognized capitalization and punctuation, but that "he does not consistently apply learned rules." Tr. 266.

In the fourth grade, his special education teacher noted that he is a slow reader, reading about 35 words per minute[12], where the average fourth grader reads 105-135 words per minute. She also said he has trouble writing in complete sentences. Tr. 310. Ryan was in regular science class in the fourth grade, but his teacher said he "has difficulty concentrating and staying on task. . .He usually gets lost in looking at what everyone else is doing." Tr. 313. His testing in math placed him in the 2nd percentile– he completed three problems (and only half of those correctly) on the test, whereas the typical fourth grader completes 11-12 problems correctly. Tr. 363. Ryan was also given a test on his written language skills, and again he scored in the 2nd percentile and was deemed "well below grade level." Tr. 363-64.

In the fifth grade, Ryan started the year reading close

[12]This is a mid-second grade level of reading. Tr. 351, 363.

to two grade levels behind (3.05 level) and by mid year was up to 3.50– still approximately two years behind[13]. Tr. 369. His science and social studies teacher completed a "Teacher Questionnaire" wherein he marked that Ryan had "a serious problem" in five of ten factors under the "Acquiring and Using Information" category. He said Ryan had "an obvious problem in three of those areas, and "a slight problem" in the remaining two areas. Tr. 536. That teacher rated Ryan as having either an obvious or serious problem with nine of the thirteen factors under "Attending and Completing Tasks." Tr. 537.

In September 2001, Ryan's parents reported that he cannot make change nor tell time– he was 11 at that time. Tr. 440. On October 31, 2001, one of Ryan's sixth grade teachers said that he functioned at an upper second to lower third grade level. Tr. 485. She went on to say that he tries to do everything asked of him but at times spaces off and becomes confused– he is unable to complete work without assistance. Tr. 485. At that time, it was recommended that he be moved from general education science and social studies classes to

---

[13]As the test was given "mid-year" of Ryan's fifth grade academic year (approximately 5.5), the Court assumes (and logic dictates) that a 3.5 score is two years behind.

special education in those classes. Thus, Ryan was transitioned to all special education classes. Tr. 487, 497. In the fall of 2001, on the Iowa Test of Basic Skills, Ryan scored in the 31st percentile, whereas the class average was the 50th percentile. Additionally, Ryan's sixth grade teacher also completed a "Teacher Questionnaire." Under the "Acquiring and Using Information" section, she marked that Ryan has an "obvious" or "serious" problem in seven of the ten areas. Tr. 544. In the "Attending and Completing Tasks" section, she indicated that Ryan had "a slight problem" in four of the thirteen areas. Tr. 545.

In January 2002, Ryan's father reported that Ryan cannot tie his shoes and he needs constant reminding regarding his personal hygiene. Tr. 452.

In October 2002, in the seventh grade, Ryan's reading was up to a sixth grade level. Tr. 519. However, his math was still well below grade, at a 3.7 grade level. Tr. 520. His math teacher noted "money skills . . . a concern" on his report card. Tr. 567.

Under the regulations for acquiring and using information, a child between the ages of 6 to 12, should be able to "learn to read, write, and do math, and discuss

history and science." He should be able to demonstrate what he has learned, "producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions." He should be able "to use these skills in daily living situations" such as "making change." He "should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups. . ." 20 C.F.R. 416.926a(g)(2)(iv). By ages 12 to 18, the child "should continue to demonstrate what [he has] learned in academic assignments" and be able to demonstrate what he has learned in daily living such as "going to the store" and "carrying out instructions." 20 C.F.R. 416.926a(g)(2)(v). Examples of limited functioning in this domain include: "difficulty in recalling important things [Ryan] learned in school yesterday" and "difficulty solving mathematics questions or computing arithmetic answers." 20 C.F.R. 416.926a(g)(3).

Clearly, based on the school records and the testimony of Ryan's father, he is markedly limited in this domain. Ryan has consistently tested around two grade levels behind his actual grade, he could not tie his shoes at the age of eleven, and he couldn't make change in the fifth and sixth grades. Tr. 440,

544.

Next, the regulations state that in the attending and completing tasks domain, a child aged 6 to 12 "should be able to focus [his] attention in a variety of situations in order to follow directions, remember and organize [his] school materials, and complete classroom and homework assignments. [He] should be able to concentrate on details and not make careless mistakes in [his] work (beyond what would be expected in other children [the same] age who do not have impairments)." 20 C.F.R. 416.926a(h)(2)(iv). "[Ryan] should be able to change his activities or routines without distracting [himself] or others, and stay on task and in place when appropriate. [He] should be able to sustain [his] attention well enough to. . . stay on task. . . and complete family chores. 20 C.F.R. 416.926a(h)(2)(iv).

Under this domain, by ages twelve to eighteen, Ryan "should also be able to organize [his] materials and to plan [his] time in order to complete school tasks and assignments." 20 C.F.R. 416.926a(h)(2)(v). Some examples of limited functioning in this domain, listed in the regulations, are: being "easily distracted," ". . .giv[ing] up on tasks," and requiring "extra supervision to keep you engaged in an

activity." There is ample evidence in the record that Ryan is markedly limited in this domain, in that he has to have an aide keep him on task while in class– either in performing his schoolwork or completing tests. Also, as mentioned, his father testified that he always has to "be on [Ryan]" to get him to do his homework, do chores, change his clothes, and get ready for school.

It is clear from the evidence in the record that Ryan's behavior in school and daily living, when compared to children his same age who do not have any impairments, is obviously markedly limited in his ability to acquire and use information, and also to attend to and complete tasks. The fact that Ryan's mother reports to his medical doctors that he is "alright," and they automatically adopt her conclusions, cannot carry the day. Ryan needs constant attention in school and at home in order to get even the simplest thing done. He requires extra time to learn general concepts. This Court is persuaded that the evidence on the record as a whole supports a finding that Ryan is in fact markedly limited in two functional domains. Accordingly, this Court cannot affirm the decision of the ALJ. That decision has little support in the record. Indeed, the record supports that Ryan continues to be

disabled due to his learning disability and the ADHD. "Although remand . . . is the normal remedy, remand is not necessary where the record overwhelmingly supports a finding of disability." <u>Taylor v. Chater</u>, 118 F.3d 1274, 1279 (8th Cir. 1997). The Court reverses and remands for the computation of benefits.

**Upon the foregoing,**

**IT IS HEREBY ORDERED** that the decision of the ALJ is reversed, and the Commissioner is directed to compute and award disability benefits to Ryan back to August 1998, when his benefits were discontinued. A timely application for attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412 (EAJA), must be filed within thirty days of the entry of final judgment in this action. Thus, if this decision is not appealed, and Ryan's attorney wishes to apply for EAJA fees, he must do so within 30 days of the entry of the final judgment based on the Order in this case.

**IT IS SO ORDERED** this 19th day of January, 2006.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa